# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JOHN SHEPARD,

                                         Plaintiff,

        v.                                              5:16-CV-1347 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                         Defendant.

STEVEN R. DOLSON, ESQ., for Plaintiff
MICHELLE L. CHRIST, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.    PROCEDURAL HISTORY

On October 15, 2012, plaintiff protectively filed an application for Supplemental

Security Income ("SSI") and an application for Disability Insurance Benefits ("DIB"),

each alleging disability beginning October 13, 2010.  (Administrative Transcript ("T")

at 190-91).  The applications were denied initially on March 19, 2013. (T. 110-13, 114-

17).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which

was held on July 30, 2013.[1] (T. 27-51).  On October 7, 2013, ALJ Marie Greener found

---

[1] At plaintiff's first hearing, his attorney amended the onset date to May 14, 2011. (T. 913).
Counsel repeated the amended onset date at the April 6, 2015 hearing. (T. 947).  However, in the ALJ's
most recent decision, she has listed the onset date as October 13, 2010. (T. 893).  It does not appear

plaintiff was not disabled. (T. 13-21).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on May 28, 2014. (T. 1-3).

Plaintiff appealed the Commissioner's final decision to the United States District Court for the Northern District of New York, and on August 14, 2014, the Court reversed the Commissioner's decision by consent of the parties and ordered the plaintiff's case remanded for further proceedings. (T. 1015-19).  On October 28, 2014, the Appeals Council remanded the action to ALJ Greener with instructions for further proceedings. (T. 1020-25).  ALJ Greener held a new hearing on April 6, 2015, at which plaintiff and Vocational Expert ("VE") David Festa testified. (T. 944-87).  On June 4, 2015, ALJ Greener found that the plaintiff was not disabled. (T. 893-903).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of ALJ Greener's decision on September 19, 2016. (T. 883-86).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

---

that the onset date was changed back to the original.  The court assumes this was in error.  Plaintiff does not mention the onset date in his memorandum of law. (Dkt. No. 9).  On remand, the Commissioner should clarify the date that is being used for the onset of disability.

continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In

addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities.  If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations.  If the claimant has such an impairment, the
> [Commissioner ] will consider him disabled without considering
> vocational factors such as age, education, and work experience . . . .
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.  The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ

cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   <u>FACTS</u>

Plaintiff was 52 years old at the time of the most recent hearing before ALJ Greener. (T. 949).  He is 5'7" tall, and at the time of the hearing, weighed approximately 245 pounds. (*Id.*)  Plaintiff lived with his sister. (*Id.*)  Plaintiff is a high school graduate, but did not attend college. (T. 950).  His past relevant work was as a supervisor for a waste management company. (*Id.*)  His work involved teaching other employees how the system worked and how to properly recycle materials. (*Id.*)  Plaintiff testified that occasionally, he would have to lift more than 20 pounds, but he could alternate sitting and standing. (T. 951-52).  Plaintiff testified that he could sit down and watch the other employees work. (T. 952).  Plaintiff worked at this job for approximately three years. (T. 951).

Plaintiff stated that he could not perform his past relevant work because it would bother his back. (T. 952).  Although he could sit down when he wanted to, he was also responsible for walking around to each station to make sure the other employees were performing their jobs correctly. (*Id.*)  Plaintiff also described the jobs that he performed prior to the waste management supervisor. (T. 953-56).  Plaintiff worked as a baker and a crew leader at Dunkin Donuts, a hardwood floor installer and refinisher, and a metal cutter for Morris Manufacturing. (T. 954-56).  Each of these occupations contained some function that plaintiff was incapable of performing at the time of the hearing. (*Id.*)

In addition to having lifting requirements that exceeded plaintiff's current ability, the metal cutter job would be too "much strain on [his] breath." (T. 956). Plaintiff testified that he quickly became short of breath. (*Id.*) Later during the hearing, plaintiff testified that his waste management job required him to walk up and down steps, which he would be unable to do because he would be out of breath. (T. 968). Plaintiff stated that he would "run out" of breath in about six steps. (T. 969). The Dunkin Donuts job was too strenuous because plaintiff was responsible for putting all the bagels and donuts up on shelves, and his current condition would force him to stop too often to be able to complete the work. (*Id.*) Plaintiff testified that he could not do the Morris Manufacturing job due to the chemicals triggering his breathing problems. (*Id.*)

The ALJ then questioned plaintiff at length about his "shortness of breath." (T. 957-59). Plaintiff stated that this condition was getting worse. (T. 957). The ALJ asked plaintiff about the medication that he took for his breathing problem. (T. 958). Plaintiff testified that he used four inhalers. (T. 956). Plaintiff mentioned inhalers, Albuterol and Spiriva, in addition to a capsule and another "little puffer." (T. 958, 973). Plaintiff testified that his shortness of breath was triggered by walking, sitting too long, and lifting. (*Id.*)

Plaintiff then testified that he was going to Syracuse Orthopedic Specialists ("SOS") for his back pain. (T. 959). Plaintiff stated that the physical therapy, aquatic therapy, and nerve block injections were not successful in lessening the pain. (T. 959-60) He did receive some relief by using a Transcutaneous Electrical Nerve Stimulation ("TENS") Unit. (*Id.*) Plaintiff stated that the TENS Unit relaxed him and relieved the

6

pain for a little while, but when he took the unit off, the pain came right back. (T. 960).
Plaintiff also testified that he took "a lot of pills" for his back, his gout, and his
diabetes. (T. 960-61).

Plaintiff testified that any activity could make his back hurt, and that he was
unable to play basketball or even walk around the block without pain. (T. 961).
Plaintiff also stated that he could not sit or stand too long or walk too far. (T. 962).  The
ALJ noticed that plaintiff was using a cane, and plaintiff stated that he had been using
the cane since he quit working. (*Id.*)  The plaintiff testified that he still drank alcohol
"occasionally," but was not receiving treatment for any psychological disorder or
mental illness. (*Id.*)

Plaintiff stated that he spent his days at home watching DVDs. (T. 963).  He
could cook "little things" and went out with his sister to buy groceries, but did not carry
any of the bags. (*Id.*)  Although plaintiff stated that he did not have "trouble" cooking,
he stated that he alternated between sitting and standing when he cooks. (T. 965).
Plaintiff stated that he could only stand for 10 or 15 minutes before he had to sit down
and rest. (*Id.*)  If he had to chop anything, he sat down to do it. (*Id.*) Plaintiff testified
that he only spent a total of 45 minutes cooking. (*Id.*)  Plaintiff visited friends if they
came and pick him up, and he played a lot of chess and watched movies with his
friends. (T. 964).

Plaintiff testified that after about 10 or 15 minutes of doing anything, he had to
sit down, relax, and sometimes, put on his TENS Unit. (T. 966).  He used the TENS
Unit every night, and he took it off when he went to bed. (*Id.*)  Plaintiff testified that he

could only sit for a total of 15 to 20 minutes at a time, then he had to get up, and try to "walk it off a little bit," before he could sit back down. (T. 967). The "whole process" took about 10 minutes. His most comfortable position was laying on his side, but he testified that he did not lie down all day because he could "always get up and just move around" if he got uncomfortable. (*Id.*) Plaintiff testified that he still smoked about three cigarettes per day. (T. 967-68).

Plaintiff testified that he used his cane at all times, and he needed it to maintain his balance while standing. (T. 970). He testified that he even went to the hospital with his cane. (*Id.*) Plaintiff stated that his doctor gave him a new cane when he was at the hospital, and his knees buckled "and almost gave out." (*Id.*) Plaintiff testified that he could shower, but that it was a "slower process." (*Id.*) Plaintiff kept his shoes tied and used a long shoe horn to put them on because he could not bend at the waist due to the pain in his back. (*Id.*)

Plaintiff stated that he did not lift anything over 10 pounds, and that even a gallon of milk was too heavy for him to lift. (T. 971). Plaintiff stated that if something were on the counter, he could move it from one side to the other. He could reach over his head, but he could not lift anything over his head. (*Id.*) Plaintiff's gout flares up every four months, but as long as he took his pills, he would be back to normal within a day. (T. 972-73).

Plaintiff testified that he had "good" and "bad" days. (T. 975). On "good" days, he tried to push himself to walk a little further, but on "really bad" days, he just stays in the house. (T. 976). Plaintiff stated that he had "bad" days twice per week. (*Id.*)

Plaintiff then stated that he really did not stay in bed all day even on a bad day. (*Id.*) Plaintiff would get up and walk around the house because if he lay down too long, his back would start hurting. (*Id.*)

The ALJ also heard the testimony of VE David Festa. (T. 977-87).  The VE asked plaintiff various questions about his former work to clarify plaintiff's duties at those jobs. (T. 977-80).  The ALJ then asked her first hypothetical question, assuming that plaintiff could perform the full range of light work, but was limited by a "mental" disorder, such that he could only perform "simple" decision-making, and have only short interactions with supervisors, co-workers, or the public. (T. 981).  The VE was further asked to assume that the individual could work in proximity to others, but his tasks should not require him to work "in conjunction" with others, and should involve working with objects, rather than people. (*Id.*)  Based on the plaintiff's testimony, the physical and mental requirements of his former occupations, and the ALJ's hypothetical, the VE opined that plaintiff could not perform any of his past relevant work. (*Id.*)

The ALJ then asked a second hypothetical question, adding the following information to the original hypothetical question: he asked the VE to assume an individual who was 48[2] years old, with a high school education, and the same past relevant work as the plaintiff.  He repeated the rest of the hypothetical above, and asked the VE whether there would be "any unskilled occupation [that] such an individual

---

[2] Plaintiff testified at the beginning of the hearing that he was 52. (T. 949).  The ALJ was using plaintiff's age at the alleged onset date in 2010.  Plaintiff's counsel had amended the onset date to 2011 at the first hearing, and stated at the second hearing that the onset date was in 2011.  It is unclear why the ALJ was using the 2010 date, but this error does not affect the court's opinion.

could perform." (T. 982).  The VE testified that there would be three jobs available - a routing clerk, a checker, and a racker. (*Id.*)  The ALJ then added that this individual must have "routine" daily tasks which do not significantly change in pace or location. (T. 983).  The VE stated that this additional limitations would not affect the individual's ability to perform the three above-mentioned jobs. (*Id.*)

Plaintiff's attorney asked the VE if the jobs that he listed would be precluded if the individual required a cane to stand or walk. (T. 984).  The VE testified that there would be no "light" work jobs that would encompass the additional limitation. However, there would be sedentary jobs that the individual would be able to perform. (*Id.*)  The available sedentary jobs for such an individual would be - surveillance system monitor, waxer, and stuffer. (*Id.*)  The VE also testified that his opinion with respect to the availability of sedentary work would not change if the individual were limited to "no bending" at the waist or reaching below the knees. (T. 986-87).  The VE stated that sedentary jobs did not require "bending, lifting, pick up." (T. 987). However, those sedentary jobs would not be available if the individual were further restricted to "occasional" reaching. (T. 985).  The VE testified that in order to perform sedentary, unskilled work, an individual must be able to reach "frequently." (*Id.*)  The VE also testified that an employer would not tolerate more than one absence in a month. (T. 985-86).

The record contains a great number of medical records, many of which are relevant to this court's decision.  Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by

plaintiff.

## IV.   **THE ALJ'S DECISION**

After reciting the procedural history of this action and finding that plaintiff was still not engaging in substantial gainful activity, ALJ Greener found that plaintiff had the following severe impairments at step two of the analysis - degenerative disc disease of the lumbar spine; diabetes; obesity; and alcoholism. (T. 895-96).  The ALJ also considered plaintiff's "mentions/allegations" of gout; gastroesophageal reflux disease ("GERD"); high cholesterol; and high blood pressure, but found that none of these impairments caused "more than minimal limitations [on] the claimant's ability to perform basic work activities." ((T. 896).  Thus, the ALJ found that these impairments were not severe. (*Id.*)

At step three, the ALJ found that none of plaintiff's severe impairments or combination of those impairments rose to the level of a listed impairment. (T. 896-98). The ALJ considered Listing 1.04 (Disorders of the Spine), Listing 12.04 (Affective Disorders), and Listing 12.09 (Substance Addiction Disorders). (*Id.*) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.09.

At step four, the ALJ found that plaintiff retained the physical RFC to perform light work. (T. 898).  In addition, the ALJ found that plaintiff was limited to work that did not require more than simple decision making and short interactions with supervisors, co-workers, and the public. (*Id.*)  Although plaintiff could work in proximity with others, tasks could not require working "in conjunction" with others, and the tasks must predominantly involve working with objects rather than people. (*Id.*)

Finally, the plaintiff was limited to routine, daily tasks in the same workplace that did not significantly change in location on a daily basis. (*Id.*)  The ALJ stated that she based her RFC finding on the opinion of consultative internist Kalyani Ganesh, M.D. and the consultative psychologist Jeanne Shapiro, Ph.D., who each examined plaintiff on January 17, 2013. (T. 504-508 (Shapiro), 509-512 (Ganesh)).

The ALJ then listed the impairments upon which plaintiff was basing his applications - back "issues," diabetes, gout, COPD,[3] GERD, high blood pressure, and depression. (T. 900).  The ALJ stated that although plaintiff's "medically determinable" impairments could reasonably be expected to cause the symptoms alleged, the plaintiff's statements regarding the intensity, persistence, and limiting effects of those impairments were "not entirely credible." (*Id.*)  The ALJ found that although plaintiff may experience pain or symptoms, he has failed to produce appropriate evidence as required by the Social Security Administration to substantiate plaintiff's "disabling symptoms." (*Id.*)

The ALJ then specifically considered most of plaintiff's stated impairments. (T. 900-901).  The ALJ rejected the extent of plaintiff's symptoms regarding his low back because "there is very little in the record in terms of diagnostic testing." (*Id.*)  The ALJ then cited to the x-ray of plaintiff's back showing only "mild" spinal stenosis and "mild" neuroforaminal stenosis. (*Id.*)  The ALJ noted that plaintiff's diabetes was ultimately "very well-controlled" and did not require any sliding scale insulin. (*Id.*)

---

[3]  COPD stands for Chronic Obstructive Pulmonary Disease.  The ALJ's step 4 analysis was the first time in the decision that the ALJ mentioned COPD, and she mentioned it only in the sentence in which she was merely repeating plaintiff's allegations. (T. 900).

The ALJ also relied on Dr. Ganesh's statement that plaintiff's cane was "not medically necessary," and noted that "nothing else in the record indicates the use of a cane." (*Id.*)

With respect to plaintiff's alcohol issues, the ALJ noted that plaintiff's use of alcohol had not prevented him from performing substantial gainful activity in the past, and that plaintiff's doctor indicated that "'all conditions [were] being managed fairly well.'" (*Id.*) (quoting Exh. 16F, p.3). Finally, the ALJ noted that at Dr. Shapiro's mental examination, plaintiff was cooperative, and his manner of relating, social skills, and overall presentation was "adequate." (*Id.*) Plaintiff was well-groomed, had adequate expressive and receptive skills, was coherent, goal directed, and had intact attention, concentration, and memory. (*Id.*) In assessing plaintiff's mental abilities, the ALJ also gave "great weight" to another consultative opinion, authored by T. Inman-Dundon, Ph.D., who opined that plaintiff could perform a job involving simple tasks. (T. 900-901).

Finally, the ALJ discussed plaintiff's obesity. (T. 901). The ALJ noted that all the examiners who rendered an opinion regarding plaintiff's RFC had either seen plaintiff in person or made note of his weight or obesity. Thus, "[a]bsent a qualifying statement, their opinions necessarily considered the claimant's obesity." (*Id.*) Based on this finding, the ALJ declined to assess additional limitations due to the plaintiff's weight. (*Id.*)

Also at step 4, the ALJ found that plaintiff was unable to perform any of his past relevant work because the work was in the "medium" exertional category. (T. 901). Because plaintiff could not perform his past relevant work, the ALJ moved to step 5 of

the sequential analysis. (T. 901-902).  The ALJ first stated that if plaintiff had the RFC to perform a "full" range of light work, the Medical Vocational Guidelines ("the Grids") would dictate a finding of "not disabled," based on plaintiff's age,[4] education, and past work experience. (T. 902).

However, the ALJ determined that plaintiff's ability to perform the full range of light work was "impeded by additional limitations." (*Id.*)  The additional limitations were in the mental abilities discussed above.  Because of these additional limitations, the ALJ utilized the testimony of VE Festa in determining that plaintiff could perform the "representative" light work occupations of Routing Clerk, Checker, and Racker, each of which existed in sufficient numbers in the national economy. (*Id.*)  Therefore, the ALJ found that plaintiff was not disabled from October 13, 2010 through June 4, 2015, the date of the ALJ's decision. (T. 903).

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ committed error by failing to assess the impact of plaintiff's medically necessary assistive device (cane) on his ability to perform work-related activities. (Pl.'s Br. at 5-9) (Dkt. No. 9).

2    The ALJ erred in failing to account for all plaintiff's severe impairments. (Pl.'s Br. at 9-12).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 6-10) (Dkt. No. 15).  For the reasons

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.21, 202.14. The ALJ chose two categories because plaintiff's age category increased from a younger individual at the time of his disability onset date to an individual closely approaching advanced age by the time of the second hearing.

stated below, the court concludes that the ALJ erred in evaluating the medical opinion evidence and finds that his RFC determination was not supported by substantial evidence.

## VI.    Severe Impairment/RFC

### A.    Legal Standards

#### 1.    Severe Impairment

The claimant bears the burden of presenting evidence establishing severity at Step Two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Rep.-Rec.), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404. 1521(b).  "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.  The mere

15

presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985)). Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ." SSR 85-28, 1985 WL 56856, at *3. However, a combination of "slight abnormalities," having no more a minimal effect on plaintiff's ability to work will not be considered severe. *Id.* The ALJ must assess the impact of the combination of impairments, rather than assessing the contribution of each impairment to the restriction of activity separately, as if each impairment existed alone. *Id.*

The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at Step Three through Step Five. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the

ALJ continued with the sequential analysis, considering all impairments, and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

## 2.    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make

conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### B.    Application

#### 1.    Severe Impairment

Plaintiff argues that the ALJ did not properly assess plaintiff's COPD.  The ALJ did not even mention plaintiff's diagnosis of COPD in her step 2 analysis. (T. 896). Defendant argues that the ALJ did not err in failing to mention the COPD because "as plaintiff acknowledges, almost all the evidence of this particular impairment were his own subjective statements." (Def.'s Br. at 6-7) (citing Pl.'s Br. at 9-12).  A review of plaintiff's brief shows that plaintiff does not "acknowledge" that COPD is "subjective."[5]  Plaintiff states that he was "diagnosed with a variety of breathing conditions including . . . [COPD] and asthma." (Pl.'s Br. at 9).

Plaintiff then cites Dr. Shapiro's "diagnosis" of COPD at p.507 of the transcript. (*Id.*)  The defendant makes much of the fact that Dr. Shapiro was the individual who

---

[5] Defense counsel may have made this observation because plaintiff's counsel also cited various parts of the record in which plaintiff "reported" significant limitations resulting from his breathing problems." (Pl.'s Br. at 10) (citing T. 40-41, 957-58, 969, 973).

did "psychological" testing, so her statement that plaintiff had COPD was "merely listing" his physical impairments. (Def.'s Br. at 7).  However, Dr. Ganesh also stated that "[plaintiff] has COPD," that he had shortness of breath mainly at night, and that he uses his inhaler as needed. (T. 509).  Dr. Ganesh also noted that plaintiff had no emergency room visits due to his COPD within the last year, but that he had been hospitalized for pneumonia at one time. (T. 509).  Dr. Ganesh then "listed" COPD as one of plaintiff's diagnoses. (T. 512).  Thus, the consultative internist, to whom the ALJ states that she gave "great weight," also "diagnosed" COPD.

The record in this case has many instances in which plaintiff was either diagnosed with COPD or asthma.  While there are many examinations in which plaintiff's respiratory status is listed as "normal," there are also many instances in which plaintiff is listed as having "shortness of breath," and/or "wheezing."  In addition to the spirometry testing on April 3, 2013, which does not indicate a "severity" on the document itself, plaintiff had a chest x-ray in January of 2014, which showed "lower lung volumes with bilateral lower lobe atelectasis,"[6] but no evidence of pneumothorax. (T. 1192, 1263).  Prior x-rays, performed in January and March of 2013 also noted "[l]ow lung volumes," which "may indicate early pulmonary venous congestion," but no evidence of pneumothorax or pleural effusion. (T. 1256-57, 1258-59).  In January of 2013, it was noted that the lungs were clear, and that there was "[n]o acute disease." (T. 1257).

---

[6] Atelectasis is defined as a complete or partial collapse of a lung or lobe of a lung, developing when tiny air sacs within the lung deflate. https://www.mayoclinic.org/diseases-conditions/ atelectasis/basics/definition/con-20034847.  The amount of lung tissue involved is variable, and it may make breathing difficult . . . particularly if lung disease is already present. (*Id.*)

Plaintiff was admitted to Upstate University Medical Center for atypical chest pain on January 11, 2014. (T. 1219).  In addition to GERD, gout, alcohol abuse, hypertriglyceridemia, and diabetes, plaintiff was also diagnosed with COPD. (T. 1220). The discharge summary indicates that plaintiff had "[d]yspnea on exertion secondary to COPD.  The patient was continued on albuterol and his home bronchodilators." (T. 1221).  Plaintiff's records from the New York Spine and Wellness Center ("NYSWC") also indicate that plaintiff was "wheezing" and that his past medical history included asthma and chronic difficulty breathing. (T. 1289, 1291 (4/7/14)).  Although some of plaintiff's examinations showed normal respiration,[7] there is no question that plaintiff has been diagnosed by medical professionals as having either asthma, COPD, or some other type of breathing problem. (*See e.g.* T. 1120-21 (SOS 1/9/15), 1124 (SOS 6/20/14), 1138 (initial visit to NYSWC), 1147 (Syracuse Community Health Ctr. 2/12/13)).  There is also no question that plaintiff has been told on several occasions that he should stop smoking. (T. 1122, 1138, 1280).

In this case, although the ALJ specifically considered impairments that she deemed "not severe," she did not even mention plaintiff's asthma, COPD, or any breathing issue in her step 2 analysis.  If the ALJ believed that plaintiff's alleged

---

[7] (T. 1198-99 - 1/15/13 - history of asthma, but no chest tightness or sob; 1208 - 3/14/13 - breath sounds normal, no respiratory distress, no wheezes; 1172 - 12/17/14 - normal ascultation, normal effort); 1280 - 1/12/15 - lungs clear to ascultation bilaterally. Normal chest expansion and respiratory effort).  Plaintiff's earlier medical records omit the diagnosis of either asthma or COPD, but still note that plaintiff takes "Ventolin" four times per day. (T. 777, 779 -July 7, 2012).  Plaintiff was also in jail at that time.  In November of 2011, plaintiff's chest x-ray was normal with "no acute pulmonary abnormality." (T. 837-38).  The court also notes that plaintiff was applying for disability insurance benefits, which would have required him to show that he was disabled prior to the date that he was last insured (September 30, 2012).  However, plaintiff is also applying for SSI benefits, for which there is no "date last insured" and for which the later medical records would be relevant.

respiratory impairment was not severe or did not constitute a medically determinable impairment, she should have made that finding at step 2, given plaintiff's diagnoses. As stated above, normally, an error at step 2 will be considered harmless if the ALJ proceeds to subsequent steps of the analysis and considers the non-severe impairment in formulating plaintiff's RFC. *Tryon, supra.* In this case, the ALJ did proceed to the subsequent steps of the analysis, but as discussed below, the ALJ also erred at step 4 in her analysis of plaintiff's COPD.

### 2. RFC

Defendant states that "in another part of his [sic] decision, the ALJ demonstrated his [sic] clear awareness of the Plaintiff's COPD claims and explicitly noted Plaintiff's allegations of COPD in the context of the RFC discussion . . . ." (Def.'s Br. at 7). Defendant argues that this shows the ALJ did consider plaintiff's COPD in determining plaintiff's RFC, thereby rendering harmless any error at step 2.

A review of the ALJ's decision at step 4 shows one sentence in which she mentions plaintiff's COPD in a list of impairments upon which plaintiff bases his application for disability. However, there is no specific analysis of COPD by the ALJ, even to state that she does not find that the COPD affects plaintiff's ability to perform the full range of light work. The defendant concedes that plaintiff underwent spirometry testing, but argues that, although plaintiff's brief "characterized" the results as "severe," no physician made that conclusion. (Def.'s Br. at 7) (citing T. 1192). Defense counsel also points out that, even though plaintiff may have had COPD, he still smoked at the time. (Def.s' Br. at 7).

In *Wilferth v. Colvin*, 363 F. Supp. 3d 359, 363 (W.D.N.Y. 2014), the court held that regardless of whether plaintiff smoked, it was "the absence of evidence supporting COPD-related impairments . . . that was dispositive of the ALJ's determination." The court noted that plaintiff's treatment records "consistently reflect that his lungs sounded clear, with neither wheezing nor shortness of breath, and that his respiratory rate was normal." *Id.* The court concluded that there was no evidence that the COPD affected the plaintiff's RFC, nor did the ALJ err in "failing to characterize it as a severe impairment."

However, in *Riechi v. Barnhart*, No. 02-CV-6169, 2003 WL 21730126, at *13 (W.D.N.Y. June 3, 2003), the court found that the ALJ erred in his evaluation of certain medical evidence and plaintiff's credibility when he found that plaintiff suffered from "mild" COPD, and based part of the analysis on plaintiff's smoking. *Id.* The ALJ in *Riechi* reasoned that plaintiff's smoking showed that her symptoms were mild, and her COPD was not severe. The court found error in the ALJ's analysis because the ALJ did not discuss the pulmonary function test that was in the record, and the ALJ's statement that there was "little in the way of treatment" ignored the fact that plaintiff's doctors had prescribed "various inhalers." *Id.* The court also rejected the ALJ's determination that plaintiff's smoking meant that the symptoms were "mild" because "many people with disabling COPD . . . continue to smoke because of their addiction to nicotine."[8] *Id.*

In this case, although there are also many examinations during which plaintiff's lungs were found "normal," there are also x-rays showing decreased lung volume and a

---

[8] The ALJ in this case did not mention plaintiff's smoking, although defense counsel mentioned that the spirometry report "itself showed that the plaintiff continued to smoke." (Def.'s Br. at 7).

pulmonary function test (spirometry) that the ALJ does not even mention.  Moreover,

plaintiff has been prescribed a variety of medications for his condition. (T. 1192).

Defense counsel dismisses the existence of this pulmonary function test by stating that

"counsel," rather than a physician, characterized the outcome of the test as showing a

"severe" obstruction. (Def.'s Br. at 7).  Although, there is no specific evaluation of the

pulmonary function test by a physician, neither plaintiff's counsel nor defense counsel

could interpret such a document accurately, nor could either counsel or the court

determine what effect such test results could have on plaintiff's functional abilities,

including the ability to perform a full range of light work.[9]

If in fact, the ALJ was "implicitly" considering plaintiff's COPD, this is a

situation in which contacting a physician to interpret this document may have been

extremely important. *See Rodriguez v. Berryhill*, No. 6:17-CV-6048, 2017 WL 513342,

at *3 (W.D.N.Y. Nov. 6, 2017) (court held that ALJ abdicated his duty to develop the

record by obtaining all pertinent records and recontacting the treating physician if he

required clarification) (citing inter alia *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118

(2d Cir. 1998)).  This is true even under the current amended regulations which afford

the ALJ more discretion to determine the best way to resolve inconsistencies or

insufficiencies. *Id.* (citing *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 505

(S.D.N.Y. 2014) ("The applicable regulations required the ALJ to recontact Dr. Bogard.

Even under the current amended regulations, which give an ALJ more discretion to

---

[9] The ability to do light work encompasses the ability to do "a good deal of walking or standing." 20 C.F.R. §§ 404.1567(b); 416.967(b).  It would seem logical that, depending on the severity of the COPD," plaintiff's ability to do a "good deal" of walking could be affected.

'determine the best way to resolve the inconsistency or insufficiency' based on the facts of the case, the first option is still to recontact the treating physician.") (citing 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (2013); *Lowry v. Astrue*, 474 F. App'x 801, 805 n. 2 (2d Cir. 2012) (footnote omitted)).

This is not a case in which there is a "lack" of evidentiary support, on a matter for which the plaintiff bears the burden of proof because the pulmonary function test exists in the record.  It is the evaluation of the test that could be critical to the ALJ's RFC decision.  A "lack" of evidentiary support is not the equivalent of a conflict or ambiguity which may preclude an ALJ from issuing a decision without seeking further evidence. This is an obvious gap in the record that must be filled.  Thus, the ALJ's error at step 2 is not harmless because her analysis at step 4 does not appear to properly take plaintiff's COPD into account, either explicitly or implicitly, given the diagnosis in the record. *Lora v. Colvin*, No. 16-CV-3916, 2017 WL 4339479, at *9 (S.D.N.Y. Sept. 12, 2017) (remand is appropriate when there are obvious gaps in the record and the ALJ has failed to seek out additional information to fill those gaps) (citing *Lopez v. Comm'r of Soc. Sec.*, 622 F. App'x 59 (2d Cir. 2015)).

Generally, these principles are applied when the ALJ is rejecting the opinion of a treating physician as not supported by specific clinical findings. *Lopez*, 622 F. App'x at 60 (citation omitted).  In this case, the court cannot determine why the ALJ may or may not have "rejected" the evidence of COPD in this document, because she failed to mention it at all.  It is thus, even more important to obtain more information on this issue.  Because the ALJ erred at step 2 and did not properly consider plaintiff's COPD

at step 4, the ALJ's RFC is flawed.

Plaintiff also argues that the ALJ failed to properly determine the effect of plaintiff use of an assistive device in finding that plaintiff had the RFC for light work. The ALJ found that "the consultative examiner indicated the use of a [cane] is not medically necessary. Furthermore, ***nothing else in the record indicates the use of a cane.***" (T. 900) (emphasis added). Dr. Ganesh stated as follows:

> Gait normal. Cannot walk on heels and toes. Cannot squat. Stance normal. Used a cane. The claimant using the cane primarily for support. The claimant's use of the cane does not ***appear necessary***.

(T. 510). It is not completely clear that Dr. Ganesh found specifically that the plaintiff's use of the cane was not medically necessary.

Social Security Ruling 96–9p provides that there "must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which the assistive device is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain, and any other relevant information)." *See* SSR 96–9, 1996 WL 374185, at *7. A cane need not be prescribed to be considered medically necessary, but there must be specific medical documentation establishing the need for it and the circumstances surrounding that need. *Hoke v. Colvin*, No. 1:14-CV-663, 2015 WL 3901807, at *14 (N.D.N.Y. June 25, 2015). Plaintiff has the burden to establish such medical necessity.[10] *Wilson v. Comm'r of Soc. Sec.*, No. 6:13-CV-643, 2014 WL 4826757,

---

[10] It has been noted that in many cases in which the Commissioner's decision is affirmed, the plaintiff failed to demonstrate that the cane was medically necessary. *See Feringa v. Comm'r of Soc.*

*10–11 (N.D.N.Y. Sept. 29, 2014). A physician's observation that a patient used a cane or had an unsteady gait does not satisfy this burden. *Hoke*, 2015 WL 3901807, at *14.

In this case, contrary to the ALJ's statement, there are multiple medical records that mention plaintiff's cane, and some that "encourage" plaintiff to continue to use the assistive device. (*See e.g.* T. 350, 575, 1269, 1272, 1278, 1285, 1291, 1295, 1297, 1306). In *Feringa*, the court noted that "although the cane was not prescribed, it was approved by plaintiff's medical providers, and various medical professionals, including the consultative examiner, considered the cane to be medically necessary." 2016 WL 5417403, at *6.

On December 17, 2013, the medical report from NYSWC stated that plaintiff was "encouraged" by her medical providers to use assistive devices, including cane and wheelchair. (T. 1306). On April 7, 2014, plaintiff's treating providers at the NYSWC noted that plaintiff was "using a cane" during his visit. (T. 1290). At the end of the report, under a section entitled "Fall Precautions," his medical providers encouraged the use of "necessary" assistive devices, including the cane.[11] (T. 1291). A February 20,

---

*Sec.*, No. 5:15-CV-785, 2016 WL 5417403, at *6 (N.D.N.Y. Sept. 9, 2016) (Rep't-Rec.) (citing *Allen v. Commissioner of Soc. Sec.*, 5:15-CV-1557, 2016 WL 996381 (N.D.N.Y. Feb. 22, 2016); *Gordon v. Colvin*, 1:14-CV-541, 2015 WL 4041729 (N.D.N.Y. July 1, 2015), *Hoke v. Colvin*, 1:14-CV-663, 2015 WL 3901807 (N.D.N.Y. June 25, 2015); *Canabush v. Commissioner of Soc. Sec.*, 1:13-CV-429, 2015 WL 1609721, at *5 (N.D.N.Y. Apr. 10, 2015); *Stanley v. Colvin*, 6:12-CV-1899, 2014 WL 1311963, at *8 (N.D.N.Y. Mar. 31, 2014)). The court in *Feringa* also cited *Johnson v. Barnhart*, 312 F. Supp. 2d 415, 428 (W.D.N.Y. 2003), in which the court reversed the Commissioner, finding that the ALJ's rejection of the consultative examiner's conclusion that plaintiff needed a cane, without obtaining clarification was legal error).

[11] These reports are electronically signed by both a nurse practitioner and a physician. (*See* T. 1291-92, 1298).

2014 report also "encourages" the use of his cane. (T. 1297).  Finally, there is a notation on one of the records from Syracuse Community Health Center ("SCHC") which appears under a notation dated July 5, 2013, and states that "Karen @ Rothchild's asked for office notes for Rx of CANE the pt's insurance requires . . . ." (T. 1194). Although there is no follow-up to this note, and no prescription for a cane exists in the record, this note implies that there may be a prescription for a cane for plaintiff.  Either way, the ALJ's statement that "nothing else in the record indicates the use of a cane" is error.

The ALJ found that plaintiff could perform light work.  Because she found that a cane was not medically necessary, she did not include the use of a cane in her RFC, and because she did not consider plaintiff's breathing problems, there was no discussion of plaintiff's COPD in her RFC analysis.  This court finds that the ALJ's RFC determination was not supported by substantial evidence, and the case should be remanded for further consideration of plaintiff's RFC, including clarification of the necessity of plaintiff's cane.

## VIII.  VE and Step 5

### A.    Legal Standards

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).  But if

plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE"). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id.* at 276-277.

### B.    Application

In this case, the VE was asked to assume that plaintiff could perform light work with the only additional limitations relating to plaintiff's mental status.[12] As stated above, the ALJ's RFC analysis was not supported by substantial evidence. As a result, the VE did not have the opportunity to consider plaintiff's COPD at all. At the hearing, plaintiff's counsel asked the VE about plaintiff's use of a cane, and the VE testified that if plaintiff were required to use a cane, the stated light work jobs would ***not*** be available to plaintiff. However, plaintiff would still be able to perform certain sedentary jobs, even if he were required to use a cane. (T. 984). The VE also testified that those

---

[12] Plaintiff's mental status is not at issue in this appeal.

sedentary jobs would not be available if the individual were only able to reach

"occasionally." (T. 984-85).  Thus, the ALJ's decision that plaintiff can perform a full

range of light work is not supported by substantial evidence, and although the VE had

the opportunity to discuss the availability of sedentary work, it is not clear that plaintiff

can perform sedentary work because there have been no specific findings regarding

plaintiff's ability to perform the full range of sedentary work.

## IX.    Remand or Reversal

### A.    Legal Standards

Plaintiff argues for reversal and for remand in the alternative. (Pl.'s Br. at 12).

"When there are gaps in the administrative record or the ALJ has applied an improper

legal standard . . . remand to the Secretary for further development of the evidence" is

generally appropriate.  *Lora*, 2017 WL 433949 at *9 (citing *Lopez*, 622 F. App'x 59;

*Rosa v. Callahan*, 168 F. 3d at 79 n.5); *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.

1980).

### B.    Application

Even though the ALJ's decision is not supported by substantial evidence, this

court cannot conclude that "substantial evidence on the record as a whole indicates that

the [plaintiff] is disabled."  Thus, I cannot order a remand solely for the determination

of benefits.  *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **REVERSED** and this case

is **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for an appropriate

analysis of plaintiff's COPD, RFC, and ability to perform substantial gainful activity as discussed above, including a proper consideration of the plaintiff's need to use an assistive device (cane).

Dated: November 15, 2017

Hon. Andrew T. Baxter
U.S. Magistrate Judge